## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| **JASON KIRSCHENBAUM,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Civil Action No. 03-1708 (RCL)** |
| **THE ISLAMIC REPUBLIC** | ) | |
| **OF IRAN,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case arises from the December 1, 2001 suicide bombing at the pedestrian mall on

Ben Yehuda Street in Jerusalem, Israel.  Plaintiffs are Jason Kirschenbaum, who was a victim in

the attack, and his parents and siblings.  Plaintiffs allege that the Islamic Republic of Iran

("Iran"), and the Iranian Ministry of Intelligence and Security ("MOIS"), are jointly and severally

liable for damages from the attack because they provided material support and assistance to

Hamas, the terrorist organization that orchestrated and carried out the bombing.  As such,

defendants are subject to suit under the terrorist exception to the Foreign Sovereign Immunities

Act ("FSIA"), 28 U.S.C. § 1605(a)(7).[1]

---

[1]     The recently enacted National Defense Authorization Act for Fiscal Year 2008
("NDAA"), Pub. L. No. 110-181, 122 Stat. 3, § 1083, revised the terrorism exception to
sovereign immunity by repealing § 1605(a)(7) of Title 28 and replacing it with a separate section,
§ 1605A.  Section 1605A creates a private, federal cause of action against a foreign state that is
or was a state sponsor of terrorism, and provides for economic damages, solatium, pain and
suffering, and punitive damages.
        Plaintiffs mistakenly assert that § 1605A has automatic, retroactive application to any
action previously brought under § 1605(a)(7) within the prescribed time limit.  Rather, to benefit
from § 1605A, a plaintiff in an action pending under § 1605(a)(7) must, within 60 days from the

On August 11, 2003, plaintiffs filed their Complaint under the FSIA seeking redress for their losses.  On November 14, 2006, this Court ordered service upon defendants through diplomatic channels in accordance with 28 U.S.C. § 1608(a)(4).  On June 20, 2007, plaintiffs filed proof of service in compliance with statutory procedures and thereafter sought entry of default on October 12, 2007, based upon defendants' failure to respond or enter an appearance. Default was entered by the Clerk of this Court against both defendants Iran and MOIS on October 15, 2007.

Plaintiffs' liability and damages claims are supported by the evidence presented in the January 3, 2008 hearing on liability.  Based on all of the evidence presented, the Court makes the following findings of fact and conclusions of law and will, consistent with them, enter default judgment in favor of plaintiff and against defendants Iran and MOIS.

## FINDINGS OF FACT

### I. Generally

1.      Plaintiff Jason Kirschenbaum was born on July 1, 1983.  (Hr'g Tr. 73.)  He is a U.S. citizen who is domiciled in New York.  (*Id*. at 9–10.)  He was injured in the December 1, 2001 Ben Yehuda Street bombing.

---

date of the NDAA's enactment, either (1) refile the action; or (2) file a motion for an order giving effect to the action as if it had originally been filed under § 1605A.  *See* Section 1083(c)(2)(A) (setting forth the conditions upon which a pending action may be given effect as if originally filed under § 1605A); section 1083(c)(2)(C) (providing the time limitations for plaintiffs to file a motion or refile an action under subparagraph (A)).  Where, as here, plaintiffs in a case pending under § 1605(a)(7) fail to properly assert a cause of action under § 1605A within the 60-day limit, the court will retain jurisdiction under § 1605(a)(7).  *See Simon v. Republic of Iraq*, 529 F.3d 1187, 1192 (D.C. Cir. 2008) (holding that courts retain jurisdiction over cases pending pursuant to § 1605(a)(7) when Congress enacted the NDAA).

2.      Plaintiff Isabelle Kirschenbaum is a U.S. citizen who is domiciled in New York.  (*Id*.)

She is Jason Kirschenbaum's mother.  (*Id*. at 7.)

3.      Plaintiff Martin Kirschenbaum, who passed away since the date of this Court's

evidentiary hearing, was a U.S. citizen domiciled in New York.  (Supp. Ex. 1A.)  He was Jason

Kirschenbaum's father.[2]  (Hr'g Tr. 25.)

4.      Plaintiff Joshua Kirschenbaum is a U.S. citizen who is domiciled in New York.  (*Id*. at 9,

44.)  He is Jason Kirschenbaum's brother.  (*Id*. at 7.)

5.      Plaintiff David Kirschenbaum is a U.S. citizen who is domiciled in New York.  (*See id*. at

10.)  He is Jason Kirschenbaum's brother.  (*Id*. at 9.)

6.      Plaintiff Danielle Teitlebaum is a U.S. citizen who is domiciled in New York.  (*See id*. at

10.)  She is Jason Kirschenbaum's sister.  (*Id*. at 63.)

7.      Jason Kirschenbaum was raised in a close, Orthodox Jewish family.  (*See id*. at 26.)

Isabelle and Martin Kirschenbaum have been married for forty years.  (*Id*. at 7.)  Jason is the

youngest of the five Kirschenbaum children—the "baby" of the family.  (*Id*. at 74.)

8.      Jason was always very close to his family members, especially his brother Joshua

Kirschenbaum with whom he played sports, attended school, and spent a lot of time.  (*Id*. at 43.)

The entire family, including his older siblings, took care of Jason as he was the youngest of the

children.  (*Id*. at 8, 74.)

---

[2] Leave will be granted to substitute the Estate of Martin Kirschenbaum when an Administrator and Executor is appointed under state law.

9.      After graduating from Yeshiva University in September of 2001, Jason traveled to Israel

to study.  (*Id.* at 74.)  Joshua Kirschenbaum was already living in Israel at that time.  (*Id.* at 43.)

At the time Jason Kirschenbaum was in Israel, only a couple of months following the Sbarro

bombing, students were advised not to go out because of concerns of additional attacks.  (*Id.* at

75.)  Shortly after he arrived in Israel, the September 11 attack occurred.  (*Id.*)

10.     In October 2001, Martin and Isabelle Kirschenbaum, their daughter Danielle Teitlebaum,

her husband, and her nine-month-old son, traveled to Jerusalem for Sukkot.  (*Id.* at 8, 65.)  Their

trip was in such proximity to September 11, 2001, that the family members had a heightened fear

of terrorist bombings and took precautions as they traveled.  (*Id.* at 9.)

11.     The threat level in Israel during the fall of 2001 remained at a constant state of danger.

(*Id.* at 44.)  Cellular phones were kept on-hand at all times to facilitate ease in communication

between attacks.  (*Id.* at 45.)

## II.     The Ben Yehuda Street Attack

12.     On December 1, 2001, around 10:30 or 11:00 p.m., Jason Kirschenbaum was heading

toward the pedestrian mall on Ben Yehuda Street to meet friends after playing a game of floor

hockey.  (*Id.* at 76, 77.)

13.     Jason Kirschenbaum was walking toward Burger King on Ben Yehuda Street when

suddenly he heard a loud explosion up the street.  (*Id.* at 78.)  Seconds later, he heard another

loud explosion and was simultaneously thrown to the ground.  (*Id.*)  There were two bombers and

a car bomb, for a total of three bombs.  (*Id.* at 16.)  The first bomb went off at the end of Ben

Yehuda Street, and the second bomb went off right next to Jason Kirschenbaum.  (*Id.* at 78.)

4

14.     When Jason Kirschenbaum got up, he realized that he had no control of his left arm.

(*Id.* at 79.)  There were wounded people and bodies on the street, smoke, screaming, and car

alarms going off around the block.  (*Id.* at 80–81.)  He sought help but observed that others

around him were also badly wounded.  (*Id*. at 79–80.)  He saw people on the ground and was not

sure if they were alive.  (*Id.* at 82.)  He also realized that his left leg had been hit.  (*Id.* at 81.)

15.     At least 10 people were killed and 120 wounded as a result of the attack.  (Hr'g Ex. 3 at

83.)  Hamas, also known as the Islamic Resistance Movement, claimed responsibility for the

December 1, 2001 attack.  (*Id*.)  Hamas is an organization supported by Iran, "dedicated to the

waging of Jihad, or a holy war employing terrorism with the object of seizing the leadership of

the Palestinian people and asserting sovereignty and the rule of the Muslim religion over all of

Palestine, including all territory of the State of Israel."  *Bodoff v. Islamic Republic of Iran*, 424 F.

Supp. 2d 74, 79, ¶ 10 (D.D.C. 2006) (Lamberth, J.) (quoting *Weinstein v. Islamic Republic of

Iran*, 184 F. Supp. 2d 13, 19, ¶ 24 (D.D.C. 2002) (Lamberth, J.)).

16.     Defendant Iran "is a foreign state and has been designated a state sponsor of terrorism

pursuant to section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C.A. § 2405(j))

continuously since January 19, 1984."  *Flatow v. Islamic Republic of Iran*, 999. F. Supp. 1, 9,

¶ 19 (D.D.C. 1998) (Lamberth, J.).  In 2001, "Iran remained the most active state sponsor of

terrorism," continuing to provide terrorist groups with funding, safe haven, training, and

weapons.  (Hr'g Ex. 3 at 64–65.)

17.     The December 1, 2001 bombing was not the first multiple suicide attack on Ben Yehuda

Street perpetrated by Hamas.  The terrorist group was also responsible for a virtually identical

multiple suicide attack at the pedestrian mall on Ben Yehuda Street in 1997.  That attack killed 5

and wounded nearly 200 people.  *See Campuzano v. Islamic Republic of Iran,* 281 F. Supp. 2d

258, 261 (D.D.C. 2003) (Urbina, J.).

18.     Isabelle Kirschenbaum learned of the attack on December 1 when saw a television news

flash reporting that there was a bombing in Jerusalem.  (Hr'g Tr. 10.)  She immediately panicked

because she saw Jason being put into an ambulance (*id.* at 11), recognizing him from his clothes

and shoes.  (*Id.* at 17.)  She ran upstairs and told her husband that Jason was at the bomb scene

and that they had to go to Israel.  (*Id.* at 11.)

19.     Isabelle and Martin Kirschenbaum tried to contact Jason and when they had no success,

they contacted other family members and friends in Israel.  (*Id.* at 12.)

20.     Danielle Teitlebaum, who is seven years older than Jason, learned of the December 1,

2001 bombing while she was at her brother-in-law's house.  (*Id.* at 67.)  She immediately called

her brother, Joshua whom she knew was also in Israel.  (*Id.*)  When she heard that Jason could

not be found, she put the phone down and started to scream.  (*Id.*)  Soon after, she called her

mother who was crying into the phone.  (*Id.* at 68.)  When Danielle Teitlebaum reached her

parents' home, she found them frantic and crying.  (*Id.*)

21.     David Kirschenbaum is ten years older than Jason and is the second oldest child in the

family.  (*Id.* at 56.)  When he saw the bombing on television, he had a bad feeling because he

knew that kids studying in Israel frequently went out on Ben Yehuda Street on Saturday nights

and sensed that his brother would likely be there.  (*Id.* at 58.)

22.     Joshua Kirschenbaum, who was working in Tel Aviv, was out to dinner with friends

when he received a call informing him of the bombing.  (*Id*. at 45.)  His immediate reaction to the news was to call Jason, but when his brother did not answer after repeated attempts, he became very nervous.  (*Id*.)

23.     Joshua Kirschenbaum started to call his friends and after some time he learned that Jason was injured in the bombing.  (*Id*. at 46.)  Joshua Kirschenbaum immediately left the restaurant and headed for the hospital in Jerusalem.  (*Id*.)  The emergency room was chaotic when he arrived.  Joshua became even more nervous when he saw badly wounded people and bodies covered with sheets but could not find his brother.  (*Id*. at 47.)

24.     The hospital was packed with people running around and looking up and down for loved ones.  Joshua Kirschenbaum finally located Jason, who by this time, was covered in bandages.  (*Id*. at 48.)  Jason could barely move.  (*Id.* at 50.)  Joshua Kirschenbaum observed that Jason was in shock but Joshua was thankful that his brother was conscious and stable.  (*Id*. at 49.)

25.     Martin Kirschenbaum left for Israel on the same night of the attack.  (*Id.*)  While on the plane, he was informed that Jason was in surgery.  (*Id.* at 30.)

26.     Isabelle Kirschenbaum was a nervous wreck after her husband left for Israel.  (*Id.*)  She was extremely nervous and did not know what to do.  (*Id.*)  Danielle Teitlebaum stayed and slept with her mother in her room that night.  (*Id.*)

**III.     Jason Kirschenbaum's Injuries**

27.     Jason Kirschenbaum was transported to the ambulance first by a passerby and then by his

friend, Yossi Mermelstein, whom he was going to Ben Yehuda Street to meet. (*Id*. at 76). He

was taken to Shaare Zedek hospital. (*Id*. at 84.) It was very difficult for Jason to handle the

scene in the hospital after the bombing with all the injured people. (*Id*. at 84.)

28.     Multiple shrapnel and screws that were loaded with the bomb struck Jason wounding him

in the arm, leg, and back. (*Id.* at 89–93; *see also* Ex. 7A-H (photographs depicting Jason

Kirschenbaum's various body wounds that resulted from the bombing); Ex. 10A-F (x-rays

showing the same).) His arm was fractured as he fell from the force of the bomb, but his arm

was placed in soft bandages rather than a cast so that the bolts that penetrated his body could rise

to the skin's surface to be removed. (*Id.* at 96.)

29.     Following the attack, Jason struggled emotionally to communicate with his family. (*Id*. at

85.) He did not want them to hear him cry and instead wanted to show that he was doing fine.

(*Id.*) During the days following Martin Kirschenbaum's arrival, Jason requested "to be left

alone" and found it hard to talk to his father. (*Id*. at 30–31.) Jason was visited by Israeli

dignitaries during his hospital stay, (*see id.* at 31–33), but he shut himself down psychologically

and found the entire situation hard to cope with. (*Id*. at 86.)

30.     Martin Kirschenbaum spoke with Danielle Teitlebaum every day while he was in Israel,

and she was extremely upset to hear about her brother's condition. (*Id.* at 41.)

31.     Jason Kirschenbaum was invited to return to Ben Yehuda Street for the Hannukah candle

lighting. He accepted the invitation even though he was afraid to attend, but ultimately was

unable to go because he had to return to the hospital to have surgery to have additional bolts

removed from his wounds. (*Id*. at 87–88.) Jason endured extreme pain during the process. (*Id*.

at 88.)

32.     Isabelle Kirschenbaum arrived in Israel four or five days after the attack.  (*Id*. at 13.)

When she first saw Jason in Joshua Kirschenbaum's apartment in Tel Aviv, he was bandaged,

had a sling and still had open wounds so that the bolts could surface.  (*Id.*)  Isabelle

Kirschenbaum cleaned and washed her son's wounds every day.  (*Id.*)

33.     Jason's severe leg injury required him to be confined to a bed for the first week following

the attack.  (*Id*. at 96.)  He received months of physical therapy to regain strength and mobility.

(*Id*. at 97.)

34.     Instead of completing his year-long study at Yeshiva, Jason returned to the U.S.  (*Id*. at

37.)  He went to physical therapy after he returned to New York but refused to receive treatment

from a psychiatrist.  (*Id*. at 38.)

35.     Rabbi Huna, who was the rabbi at Or Sameach and Jason's rabbi at the time, also tried to

speak with him about his experience, but Jason refused.  (*Id.* at 97–98.)

36.     Jason found it difficult to talk about the incident to anyone and preferred to be left

alone.  (*Id*. at 98–99.)  He did not want to revisit the experience and suffered from bad dreams.

(*Id*. at 100.)

37.     David Kirschenbaum observed that when Jason returned to New York, he seemed distant.

(*Id*. at 60.)  Jason also seemed very tense, snappy and aggressive—all characteristics that he did

not have before the attack.  (*Id*. at 61.)  For Martin Kirschenbaum, interaction with his son

became impossible since the attack—even after Jason returned home.  (*See id*. at 39.)

**IV.**   **Jason's Current Condition**

38.   Jason Kirschenbaum has a slight change in the shape of his arm as a result of the attack. (Hr'g Tr. 36.)  Jason still experiences pain in his arm on occasion after engaging in certain activities.  (*See id.*)

39.   Jason still struggles with memories of the injuries and fatalities he saw after the attack. Loud noises such as thunder or fireworks trigger the memories, particularly at night.  (*See id.* at 100.)  Jason becomes very quiet when the memories of the attack resurface.  (*Id.*)  The sight of his scars reminds him of the bombing each time he removes his clothes, takes a shower, or looks in the mirror.  (*Id*. at 105.)  When Jason saw *The Kingdom*, a movie that depicts a similar terrorist attack, the experience was so stressful that he thought about walking out of the theater after the first 10–20 minutes.  (*See id*. at 100–101.)

40.   Since the bombing, Jason has experienced anxiety about the way he is perceived by his peers.  Rather than being labeled by his friends and relatives as "that guy that was in a terrorist attack," Jason just "want[s] to be a regular kid."  (*Id*. at 103.)

41.   Still, he keeps one of nuts from his body in his wallet as a reminder.  (*See id.* at 104.) Isabelle Kirschenbaum kept the jacket containing holes from the bolts that hit Jason, and the bolts themselves as a reminder of the attack.  (*Id*. at 20–21.)  She feels thankful that her son is alive but she is still extremely emotional about the experience and will never forget what happened.  (*Id*. at 23–24.)  Jason returned to Israel once since the attack, and it was very difficult for him.  (*Id*. at 106–107.)

## CONCLUSIONS OF LAW

### I.   Legal Standard for FSIA Default Judgment

Under the Foreign Sovereign Immunities Act, no judgment by default shall be entered by a court unless the claimant establishes his claim or right to relief by evidence satisfactory to the court.  28 U.S.C. § 1608(e); *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003), *cert. denied*, 542 U.S. 915 (2004).  In FSIA default judgment proceedings, plaintiffs may establish proof by affidavit.  *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (Urbina, J.).  Upon evaluation, the court may accept plaintiffs' uncontroverted evidence as true.  *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 255 (D.D.C. 2006) (Lamberth, J.) (citing *Campuzano*, 281 F. Supp. 2d at 268).  This Court accepts the uncontested evidence and sworn testimony submitted by plaintiffs as true in light of defendants' failure to object or enter an appearance to contest the matters in this case.

### II.   Jurisdiction

The Foreign Sovereign Immunities Act is the sole basis for jurisdiction over foreign sovereigns in the United States.  *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).  The "state-sponsored terrorism" exception provides that a foreign sovereign will not be immune to suit in U.S. courts where:

> money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

11

28 U.S.C. § 1605(a)(7).

In order to subject a foreign sovereign to suit under 28 U.S.C. § 1605(a)(7), plaintiffs must demonstrate that (1) the foreign sovereign was designated by the State Department as a "state sponsor of terrorism;" (2) the victim or claimant was a U.S. national at the time the acts took place; and (3) the foreign sovereign engaged in conduct that falls within the ambit of the statute. *Heiser*, 466 F. Supp. 2d at 254.

Plaintiffs have sufficiently demonstrated each of the elements in this case. First, defendant Iran has been designated a state sponsor of terrorism continuously since January 19, 1984. *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 9, ¶ 19 (D.D.C. 1998) (Lamberth, J.). Second, each of the plaintiffs in this action was a United States national at the time the bombing occurred. Finally, as to the third element, defendant Iran knowingly provided material support to Hamas, the entity that committed the attack. As such, Iran's support of Hamas falls squarely within the ambit of the statute. Defendant MOIS is treated as the state of Iran itself rather than its agent, *Roeder*, 333 F.3d at 234, and thus the same determinations apply to its conduct.

The FSIA provides that personal jurisdiction over a non-immune foreign sovereign exists where service of process has been accomplished pursuant to 28 U.S.C. § 1608. *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 298 (D.D.C. 2003) (Lamberth, J.). Since service has been effected and plaintiffs have established an exception to immunity pursuant to § 1605(a)(7), this Court has *in personam* jurisdiction over defendants Iran and MOIS.

**III.**   **Liability**

**A.**      **Proper Causes of Action Under the FSIA**

Section 1605(a)(7) is "merely a jurisdiction-conferring provision that does not otherwise provide a cause of action against either a foreign state or its agents." *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1032 (D.C. Cir. 2004). Once a foreign state's immunity has been lifted under § 1605 and jurisdiction is proper, § 1606 provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. Section 1606 acts as a "pass-through" to substantive causes of action against private individuals that may exist in federal, state or international law. *See Dammarell v. Islamic Republic of Iran*, Civ. A. No. 01-2224, 2005 WL 756090, at *8–10 (D.D.C. Mar. 29, 2005) (Bates, J.).

In this case, state law provides a basis for liability. First, the law of the United States applies rather than the law of the place of the tort or any other foreign law. This is because the United States has a "unique interest" in having its domestic law apply in cases involving terrorist attacks on United States citizens. *Id.* at *20.

This Court must next determine which state's law to apply. As the forum state, District of Columbia choice of law rules guide the Court's analysis. Under District of Columbia choice of law rules, courts employ a refined government interest analysis under which courts "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 41 (D.C. 1989) (citations and internal quotations omitted). This test typically leads to the application of the law of plaintiff's domicile, as the state with the greatest interest in providing redress to its citizens. *See Dammarell*, 2005 WL 756090, at *20–21.

13

Here, each plaintiff was domiciled in New York at the time of the attack, and the

Court—applying the refined government interest test—finds that New York law governs plaintiffs'

claims. As required by § 1606, New York law provides a cause of action against private individuals

for the kinds of acts alleged against defendants. Plaintiffs allege battery as to Jason Kirschenbaum

and intentional infliction of emotional distress as to all plaintiffs. Both claims are torts for which

private individuals may face liability. The Court's next task is to determine whether plaintiffs have

shown liability and damages for these claims under the laws of New York.

### B.     Vicarious Liability

The basis of defendants' liability is that they provided material support and resources to

Hamas, which personally completed the attack. One may be liable for the acts of another under

theories of vicarious liability, such as conspiracy, aiding and abetting, and inducement. This

Court finds that civil conspiracy provides a basis of liability for defendants Iran and MOIS and

accordingly declines to reach the issue of whether they might also be liable on the basis of aiding

and abetting and/or inducement.

Elements of a civil conspiracy under New York law are (1) the corrupt agreement

between two or more persons, (2) an overt act, (3) their intentional participation in the

furtherance of a plan or purpose, and (4) the resulting damage. *Heiser*, 466 F. Supp. 2d at 267

n.21 (citing *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157 (S.D.N.Y. 1998)).

As this Court has previously held, "[s]ponsorship of terrorist activities inherently

involves a conspiracy to commit terrorist attacks." *Bodoff v. Islamic Republic of Iran*, 424 F.

Supp. 2d 74, 84 (D.D.C. 2006) (Lamberth, J.) (quoting *Flatow*, 999 F. Supp. at 27). Here, it has

been established by evidence satisfactory to this Court that Iran has continuously provided

14

material support in the form of, *inter alia*, funding, training, and safe haven to Hamas and its

members so that they may undertake terrorist attacks like the one in this action.  There is no

dispute that Hamas committed the attack that injured Jason Kirschenbaum, and indeed claimed

responsibility for it.  (*See* Clawson Dep. 38:2–6, May 24, 2006.)  Finally, as will be discussed

below, the plaintiffs in this action incurred damages resulting from the injuries caused by the

conspiracy.  Accordingly, the elements of civil conspiracy under New York law are established

between Hamas and defendants Iran and MOIS.

### C.    Jason Kirschenbaum's Claims

#### 1.    Battery

Under New York Law, a battery is an "intentional wrongful physical contact with another

person without consent."  *Nikbin v. Islamic Republic of Iran*, 517 F. Supp. 2d 416, 427 (D.D.C.

2007) (Bates, J.) (citing *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001)).  "In the case

of battery, the slightest unlawful touching of the person of another is sufficient, for the law

cannot draw the line between different degrees of violence and therefore totally prohibits the first

and lowest stage, since every individual's person is sacred and no other has the right to touch it."

*Id.* (quoting *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d. Cir.

1993).  "[T]he required intent is merely that the defendant intentionally made bodily contact and

that the intended contact was itself offensive or without consent."  *Id.* (quoting *Campoverde v.

Sony Pictures Entm't*, No. 01 Civ. 7775, 2002 WL 31163804, at *11 (S.D.N.Y. Sept. 30, 2002)).

Based upon the evidence presented, plaintiff Jason Kirschenbaum has made out a valid

claim for battery under New York law.  Defendants, through their material support of Hamas,

clearly had the intent to make offensive bodily contact without consent.  In addition, plaintiffs

have proved through pictures, x-rays, and testimony, that Jason encountered direct physical

contact and consequently injured his arm, leg, and back as a direct result of this act.  (*See* Exs.

7A-H, 10A-F.)  Accordingly, defendants Iran and MOIS are liable for battery under the theory of

vicarious liability.[3]

### D.      Family Members' Claims for Intentional Infliction of Emotional Distress

New York, adopting the approach taken in section 46 of the Restatement (Second) of

Torts, recognizes intentional infliction of emotional distress as a tort.  *Heiser v. Islamic Republic*

*of Iran*, 466 F. Supp. 2d at 345–56 (citing *Howell v. New York Post Co.*, 612 N.E.2d 699, 702

(1993)).  The four elements of a claim of intentional infliction of emotional distress under New

York law are:  (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a

substantial probability of causing, severe emotional distress; (3) a causal connection between the

conduct and injury; and (4) severe emotional distress.  *Id.*  This Court has held that no presence

requirement is necessary to successfully bring an IIED claim under New York law because of the

severe nature of terrorist attacks and the wide range of potential grief and distress resulting

therefrom.  *See Peterson*, 515 F. Supp. 2d at 43; *Heiser*, 466 F. Supp. 2d at 346.  As this Court

has previously found, "a terrorist attack—by its nature—is directed not only at the victims but

also at the victims' families."  *Heiser*, 466 F. Supp. 2d at 328 (quoting *Salazar v. Islamic*

---

[3] Because Jason Kirschenbaum can recover for mental anguish and suffering under his battery claim, the Court need not separately consider his intentional infliction of emotional distress claim, which would result in an impermissible double recovery.  *See Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 40 n.7 (D.D.C. 2007) (Lamberth, J.); *see also Nikbin*, 517 F. Supp. 2d at 428 (recognizing that New York law allows a plaintiff to recover compensatory damages for assault, battery, and intentional infliction of emotional distress "for the injury itself [and for] conscious pain and suffering including mental and emotional anxiety" (internal quotation omitted)).

16

*Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005) (Bates, J.)).  The evidence in the instant action is consistent with the Court's previous findings as to the impact of terrorist attacks. Here, the evidence demonstrates that the defendants' motives in providing material support to Hamas were to facilitate a deliberately outrageous act of terrorism intended to not only cause physical harm to those present on Ben Yehuda Street, but also to instill terror in their loved ones and others.  Thus, no presence requirement is necessary for plaintiffs to bring IIED claims under New York law.  Standing to seek recovery for an IIED claim is limited, however, to the victim's near relatives which include the victim's spouse, child, sibling, or parents.  *Heiser*, 466 F. Supp. 2d at 329.

This Court further concludes that defendants' actions proximately caused the severe injury of Jason Kirschenbaum and the subsequent emotional distress experienced by Jason, his father, mother, brothers and sister.  Jason and all of the family members have endured and will continue to endure a level of emotional distress that far surpasses the level of distress a reasonable person is expected to suffer.  They are constantly reminded of that experience on a daily basis, and continue to fight fear and anxiety that has resulted from this malicious attack.

Accordingly, this Court concludes that plaintiffs have "establishe[d] [their] claims or right to relief by evidence satisfactory to the court," and are therefore entitled to the entry of a default judgment against defendants.  28 U.S.C. § 1608(e); *see Roeder*, 333 F.3d at 232.

IV.     **Damages**

    A.     **Compensatory Damages**

In determining the appropriate compensatory damages for each plaintiff's pain and suffering, this Court is guided not only by prior decisions awarding damages for pain and suffering, but also by those which awarded damages for solatium. *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 (D.D.C. 2006) (Lamberth, J.).  This Court has previously set out a general framework for compensatory awards for surviving victims of terrorist attacks including awards of $2.5 million to parents of surviving victims and $1.25 million to siblings of surviving victims. *Peterson*, 515 F. Supp. 2d at 52.  Damages for a surviving victim are typically determined based upon an assessment of the following factors: "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Id.* n.26 (quoting *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 59 (D.D.C. 2006) (Lamberth, J.).

    1.     **Award for Pain and Suffering for Jason Kirschenbaum**

The physical pain Jason Kirschenbaum was forced to endure is without doubt.  He was thrown to the floor when the bomb exploded near him.  Nuts, bolts, and other objects penetrated his body in various places creating wounds that were ultimately left open to allow the objects to surface.  The metal objects often surfaced in a different location than where they penetrated, thus creating multiple entrance and exit wounds over time.  Jason's condition required multiple surgeries, and he was unable to walk without physical therapy.  His arm is slightly misshaped as a result of the attack.

Jason also suffered extreme emotional pain and suffering from this experience.  Jason's severe emotional pain was of such a nature that he found it almost impossible to communicate to others about his feelings.  He wanted to show his family members and friends that he was alright, but really he was not.  His closest family members found him more irritable, snappy, and morose.  The emotional pain continues with him to this day, as he is constantly reminded of the experience and worries about being branded as a terrorist attack victim.

It is noteworthy that during the evidentiary hearing, Jason Kirschenbaum's entire family honored his request that they not be present in the courtroom when he testified.  It is clear from the evidence that Jason is still experiencing mental anguish, pain and suffering not only as a result of his physical wounds, but also from the sheer terror of the event and the images which are forever set in his mind.  In consideration of the severity of his injuries and nature of the long-lasting effect, this Court finds that an award of $5 million in compensatory damages is appropriate for Jason Kirschenbaum's injury and extreme pain and suffering.

### 2.        Award for Pain and Suffering for Jason's Family Members

This Court finds that Martin and Isabelle Kirschenbaum suffered extreme mental anguish both in the days surrounding the attack and afterwards.  They suffered great emotional anxiety in the hours and days that followed, not being able to make contact with him, or even find out whether he was alive.  Isabelle Kirschenbaum's pain was intensified when she saw Jason being wheeled into an ambulance.  She was so distraught by the experience that after her husband left for Israel, she had trouble sleeping at night.  Even once both parents joined Jason in Israel, they endured the sight of their youngest son with multiple open wounds, and watched him suffer as the nuts and bolts surfaced, necessitating multiple surgeries.  They tended to Jason's wounds and

accompanied him on numerous trips to the hospital for treatment, surgery, and physical therapy,

all the while dealing with the severe nature of the experience and the added strain on their

relationship with their son, who was suddenly withdrawn and reluctant to communicate.  To this

day, they are still forced to remember and relive the experience, and the pain does not go away.

This Court recognizes their past and ongoing pain and suffering and will therefore award

compensatory damages of $2.5 million for each parent.

This Court also finds that David and Joshua Kirschenbaum, as well as Danielle

Teitlebaum suffered extreme pain and suffering during and after the attack.  Joshua

Kirschenbaum, who was actually in Israel at the time of the attack, endured extreme mental

anguish upon learning that his brother was involved in the attack and later at the hospital where

he saw bodies covered with sheets and did not know whether his brother was under them, or

injured and alive.  Joshua Kirschenbaum also experienced firsthand the aftermath of multiple

surgeries, pain, treatment, therapy, psychological changes, and such, as Jason stayed with him in

his apartment after the bombing.  Both David Kirschenbaum and Danielle Teitlebaum

experienced severe emotional pain while trying to comfort their mother and simultaneously

dealing with their own fears and mental anguish associated with the bombing and the injury of

their brother.  Accordingly, this Court will follow its previous framework and award $1.25

million for each of the siblings.

### B.    Punitive Damages

Until Congress passed the National Defense Authorization Act for Fiscal Year 2008,

punitive damages were not available against foreign states.  Under the newly enacted 28 U.S.C.

§ 1605A, punitive damages may be awarded.  *See* 28 U.S.C. § 1605A(c).  Plaintiffs, however,

have not asserted a cause of action under § 1605A.  To benefit from that section, plaintiffs must have either refiled this action or filed a motion for treatment under § 1605A pursuant to section 1083(c)(2), or filed a new related action pursuant to section 1083(c)(3), within the relevant 60-day period.  Plaintiffs have taken no such action here.  Accordingly, plaintiffs' claim for punitive damages must be denied.

## <u>CONCLUSION</u>

This Court acknowledges plaintiffs' ongoing pain and anguish that resulted from the heinous acts of violence caused by defendants and the terrorists they support.  Plaintiffs should be praised for the courage and resolve they demonstrated in pursuing this action.  Their efforts are to be commended.

An Order and Judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, August 26, 2008.